UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHNNIE MCCOLLUM, | |
| Plaintiff, | CIVIL ACTION NO. 1:22-cv-1710 |
| v. | (SAPORITO, J.) |
| DAUPHIN COUNTY PRISON BOARD, *et al.*, | |
| Defendants. | |

MEMORANDUM

Plaintiff Johnnie McCollum, now incarcerated at SCI-Pine Grove, has filed an amended complaint alleging that he was subjected to unconstitutional conditions of confinement and denied access to religious literature at the Dauphin County Prison. Defendants move to dismiss the complaint for failure to state a claim. (Doc. 48). Finding that McCollum has plausibly stated certain claims for relief as to religious literature, but not as to the lockdowns, the Court grants the motion in part.

I. BACKGROUND

On April 2, 2024, the Court dismissed McCollum's first amended complaint, and granted him "a final opportunity to amend his pleading." (Doc. 39). On July 19, 2024, the Court received a second amended

complaint from McCollum, naming five defendants affiliated with the Dauphin County Prison: Warden Gregory Briggs, Deputy Warden Lionel Pierre, Grievance Coordinator Mike Welker, Chaplain Damon Fields, and the Dauphin County Prison Board. (Doc. 46).

The complaint alleges as follows: Between August 2020 and October 2022, McCollum was incarcerated at the Dauphin County Prison. For "roughly" 19-23 days per month, the prison was on lockdown due to "staff shortages." During lockdowns, inmates were confined to their cells and therefore denied access to the gym, video visits, outside recreation, and unspecified "program opportunities." As a result of the lockdowns, McCollum suffered from depression, anxiety, mood swings, and related symptoms. McCollum wrote grievances and complaints to prison "administration," including Briggs and Pierre, who are also members of the Dauphin County Prison Board. McCollum alleges that at other prisons, the prison boards alleviated staff shortages by offering "incentives" to recruit new staff, but the Dauphin County Prison Board did not offer such incentives.

McCollum also objects to the availability of religious literature at the prison. To combat the smuggling of contraband, the prison did not

permit prisoners to bring in their own books, even if they were mailed to the prison directly by a retailer. The prison digitized certain Christian, Muslim, Nation of Islam, Buddhist, and Wiccan books, among other religions, so prisoners could have continual access to those books. However, McCollum's religion is Santeria, and the prison did not digitize any Santeria books. There was at least one Santeria book available in the "general library," but the waiting list was nine months long, and when McCollum's turn came, he could only have the book for 14 days at a time.[1] While prisoners practicing other religions had "unhindered" access to their religious literature, McCollum did not. McCollum directed grievances about the issue to Briggs and Fields, and specifically asked Briggs if he could order a Santeria book "in [Briggs's] name and have him photocopy it[,] but he refused."

McCollum asserts claims under the First Amendment for interference with free exercise of religion, and claims under the Fifth and Fourteenth Amendments premised on "unnecessary punishment of a pre-

---

[1] Although the Santeria literature was not "digitized," it was apparently an e-book provided on a tablet rather than in paper form. Nonetheless, the complaint is clear that regardless of the format, McCollum only had access to it for 14 days at a time, and only subject to his place on the waiting list.

trial detainee" and unequal access to religious material.

## II. LEGAL STANDARDS

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Further, to the extent McCollum attempts to supplement his complaint with allegations through briefing on the motion to dismiss, those allegations are disregarded, because "the complaint may not be

personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014) (citation omitted). As explained by the Third Circuit Court of Appeals:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

## III. DISCUSSION

Defendants argue that the complaint must be dismissed because McCollum has not stated a claim for relief, and because they either lack the requisite personal involvement for liability or are entitled to qualified immunity.

### A. Conditions of Confinement

McCollum's conditions of confinement claims addressed to the prison lockdowns must be dismissed, for reasons explained in the Court's memorandum and order on his prior complaint. A pre-trial detainee[2] can

---

[2] The circumstances of McCollum's detention are unclear; he alleges that he was a "pre-trial detainee," but also that he was "awaiting sentencing." As with his prior complaint, the Court assesses the claim
*(continued on next page)*

pursue a claim under the Fourteenth Amendment when he is exposed to conditions of confinement that "amount to punishment." *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). When the conditions are not imposed for the "express purpose" of punishment, the question is whether the conditions are "rationally connected to a legitimate purpose but excessive in relation to [that] purpose." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 328 (3d Cir. 2020) (citing *Bell*, 441 U.S. at 538).

Here, there is no indication that the lockdowns were imposed for the express purpose of punishment; rather, McCollum explicitly alleges they were imposed to accommodate staff shortages. *See Bell*, 441 U.S. at 540 n.23 (legitimate purposes include "maintaining security and order and operating the institution in a manageable fashion"). Nor does the complaint support an inference that the conditions themselves were "excessive in relation to" this legitimate purpose. Nothing in the complaint suggests that any defendant sought to impose any harsher conditions than necessary given the staff shortages. Although the

---

under the Fourteenth Amendment, the most favorable standard to McCollum. *See* (Doc. 38 at 25 n.6).

conditions McCollum describes are clearly unpleasant, the amended complaint still lacks detail from which to infer that the conditions "amount[ed] to punishment."[3]

McCollum argues that certain defendants, as members of the prison board, should have allocated more resources to recruit new staff. With no sense of how much money was available or what the alternatives were, there is no basis to infer that intermittent lockdowns were "excessive" given the legitimate need to run the prison within a budget. Regardless, "such considerations are peculiarly within the province and professional expertise of corrections officials . . . [and] courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 540 n.23.

---

[3] McCollum is frequently vague or contradictory in discussing his conditions of confinement. For example, he alleges he was confined to his cell for "19-23 days a month." At the same time, he alleges that he had no access to the gym because of "continuous" lockdowns (Doc. 46 at 4), but also that the denial of gym time was the result of a "chain reaction" prompted by the lockdowns (Doc. 46 at 5). The Court is unable to discern whether McCollum had access to the gym on days when he was not confined to his cell. Nor does the complaint clearly describe the conditions on days when he *was* confined to his cell, other than the fact that he shared the cell with another person. The Court previously advised that without such detail, McCollum's allegations did not support an inference that the conditions amounted to punishment. *See* (Doc. 38 at 29-30).

### B. Denial of Religious Literature

McCollum alleges that the deprivation of Santeria literature violated his free exercise and equal protection rights. "Inmates clearly retain protections afforded by the First Amendment . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). A prison regulation can impinge on the right of free exercise only to the extent "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Assuming that an inmate's religious view is "sincerely held," courts consider four factors determining whether the regulation is reasonable: (1) whether the regulation bears a valid, rational connection to a legitimate and neutral government objective; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives. *Robinson v. Wetzel*, 648 F. App'x 168, 173 (3d Cir. 2016) (citing *Turner*, 482 U.S. at 89-90).

Defendants argue that as a matter of law, McCollum's free exercise

right was not affected because the Santeria book was available to him for fourteen days after a nine-month wait. However, the case they rely on, *Heleva v. Kramer*, 330 F. App'x 406 (3d Cir. 2009), does not stand for that principle. In *Heleva*, the prison permitted inmates to bring in their own books if directly shipped from publishers or retailers. The plaintiff was denied access to two books for eight months because they were not accompanied by a publisher's invoice, but received the books once the invoice was secured. He also had access to "many other similar books" from the prison library during this delay. 330 F. App'x at 408-09. *Heleva* is hardly analogous to this case, since McCollum allegedly lacked consistent access to *any* Santeria books as a direct and unavoidable result of the prison's book policy. Nor does *Heleva* support the idea that a person's religious exercise cannot be burdened by long delays in access to religious literature.[4]

---

[4] In the context of a RLUIPA claim, the *Heleva* court noted that the deprivation of the two books – "Survival Kit: 5 Ways to Spiritual Growth" and "The Power of a Praying Parent" – was not a "substantial burden" on the plaintiff's Christian practice. This was not because the eight-month delay itself was insignificant (the court described it as "undoubtedly a burden") but because the absence of those particular texts did not require the plaintiff to abandon the precepts of his religion, substantially modify his behavior, or violate his beliefs. *See* 330 F. App'x at 409.

McCollum alleges that the deprivation of the Santeria book limited his ability to "venerate [his] Orisha" and "fully educate [him]self based on his religion." Beyond this, the precise impact on McCollum's religious practice is unclear. Nonetheless, particularly since McCollum had no consistent access to Santeria[5] literature of any kind, the complaint supports a plausible inference that he was deprived of "critical religious instruction without which [he] could not practice [his] religion generally." *Sutton v. Rasheed*, 323 F.3d 236, 255-57 (3d Cir. 2003).[6]

Defendants argue that McCollum has not properly alleged the personal involvement of any defendant. The Court agrees with respect to

---

[5] At the pleading stage, the Court cannot accept defendants' inference that McCollum's religious exercise was unaffected because he had access to Roman Catholic literature and Santeria "involves elements of the Roman Catholic faith."

[6] *See also Yates v. Painter*, 306 F. App'x 778, 780 (3d Cir. 2009) ("[L]imiting an inmate's access to the religious literature that he is required to read as part of his practice constitutes a substantial burden on his religious exercise."); *Tootle v. Long*, No. 1:20-CV-00235-SPB-RAL, 2021 WL 3610034, at *5 (W.D. Pa. July 19, 2021), report and recommendation adopted, 2021 WL 3603621 (W.D. Pa. Aug. 13, 2021); *Noble v. Wetzel*, No. 2:18-CV-01160-MJH, 2020 WL 3211893, at *5 (W.D. Pa. May 11, 2020), report and recommendation adopted, 2020 WL 3196261 (W.D. Pa. June 15, 2020), aff'd, No. 22-1328, 2022 WL 16707071 (3d Cir. Nov. 4, 2022); *Johnson v. DeRose*, No. CIV 1:09-CV-0267, 2010 WL 817398, at *6 (M.D. Pa. Mar. 9, 2010) (denial of access to Bible during three-week lockdown).

all defendants except Warden Briggs. McCollum alleges that, separately from his grievances, he asked Briggs to arrange a photocopy of the Santeria book so that he could access it, and Briggs refused that request. This interaction, combined with McCollum's grievances to Briggs, supports a reasonable inference that Briggs knew McCollum did not have access to essential religious literature, was empowered to resolve the issue, and declined to do so.

For these reasons, McCollum has also stated a Fourteenth Amendment equal protection claim against Briggs. McCollum must allege that he was intentionally treated differently from similarly situated persons because of membership in a particular protected class, such as a religious group. *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002). As with McCollum's free exercise claim, a discriminatory regulation would still be justified if reasonably related to a legitimate penological interest. *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000) (citing *Turner*, 482 U.S. at 89).

McCollum alleges that books for numerous other religions were digitized to grant their adherents "unhindered" access. While this fact alone does not show intentional discrimination against him, McCollum's

subsequent interactions with Briggs would have placed Briggs on notice that Santeria was not included. The complaint supports an inference that Briggs, as the warden, was aware that religious books were digitized, and that his refusal to accommodate McCollum's request represented an intentional decision not to permit McCollum the same access to religious material as other similarly situated inmates. To the extent there was a legitimate penological interest in treating Santeria differently from other religions whose books were digitized, it is not apparent from the complaint.

Finally, Defendants argue that they are entitled to qualified immunity. Qualified immunity applies to federal and state actors unless (1) the "facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation," and (2) the alleged right was clearly established at the time of the violation. *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (citation omitted). A clearly established right is one so apparent that "every reasonable official would understand that what he is doing is unlawful." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). However, the Third Circuit has cautioned courts not

to "venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (unpublished).

Defendants present a series of conclusions that they believe foreclose any violation of a clearly established right as to McCollum's religious literature. (Doc. 50 at 24). However, these arguments are premised on inferences unjustified at the pleading stage (e.g., that McCollum's religious needs were adequately addressed by the presence of Roman Catholic literature), and statements of law that are imprecise[7] or do not encapsulate the specific conduct alleged (e.g., that prisoners are "not entitled to every implement and ritual of their religion").

As noted above, McCollum's complaint supports an inference that

---

[7] For example, defendants cite *Smith v. Kyler*, 295 Fed. Appx. 479 (3d Cir. 2008), for the premise that "no equal protection violation is viable based on the amount of shelf space any particular religion enjoys." This statement misinterprets *Smith*; in that case, the court noted that prisons could legitimately allocate resources to different religions based on their popularity, so equal protection claims should be ultimately premised on comparisons between "similarly situated faiths." 295 Fed. Appx. at 484. That principle does not (yet) support an argument for qualified immunity in this case, because nothing in McCollum's complaint indicates that Santeria was uniquely situated compared to other religions for which the prison literature was digitized.

he was denied literature that was essential to his religious practice. Although the Santeria book was "available" to McCollum in that he could receive it once every nine months for a two-week period, no reasonable official would have believed this was a permissible level of access to an essential religious text; indeed, the prison allegedly digitized such materials so that prisoners would have consistent access to them. The record may yet reveal a legitimate penological objective or that the denial of Santeria literature did not burden McCollum's religious exercise. But given the reasonable inferences to which McCollum is entitled at the pleading stage, Briggs is not entitled to qualified immunity from the complaint as pled. *See, e.g., Negrete v. New Jersey*, No. 19-CV-18480-GC-DEA, 2022 WL 17324929, at *11, 13 (D.N.J. Nov. 29, 2022) (citing cases describing that "denying prisoners access to their holy text . . . is a substantial burden on free-exercise rights"); *Roten v. Klemm*, No. 2:21-CV-0323, 2022 WL 2073044, at *5 (W.D. Pa. June 9, 2022); *cf. Sutton*, 323 F.3d at 258-260 (finding that qualified immunity applied at the summary judgment stage).

## IV. CONCLUSION

For these reasons, McCollum will be permitted to proceed on free

exercise and equal protection claims for damages against Warden Briggs only. Because McCollum is no longer at the Dauphin County Prison, any requested injunctive relief is now moot. *See Sutton*, 323 F.3d at 248. Defendants' motion will be granted as to all other claims. An appropriate order follows.

Dated: December 19, 2024        *s/Joseph F. Saporito, Jr.*
                                JOSEPH F. SAPORITO, JR.
                                United States District Judge