# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHNNIE MCCOLLUM,<br>Plaintiff,<br>v.<br>GREGORY BRIGGS,<br>Defendant. | CIVIL ACTION NO. 1:22-cv-01710<br>(SAPORITO, J.) |

## MEMORANDUM

Plaintiff Johnnie McCollum claims that defendant Gregory Briggs, the warden of the Dauphin County Prison ("DCP"), violated McCollum's First Amendment and Fourth Amendment rights by denying him access to certain religious literature for approximately nine months. Briggs moves for summary judgment (Doc. 88); McCollum, who has since returned to the DCP, requests preliminary injunctive relief (Doc. 121).

For the following reasons, Briggs's motion will be granted in part, and the case will only proceed on McCollum's First Amendment claim. McCollum's motion for preliminary injunctive relief will be denied.

## I. BACKGROUND

As relevant here, the operative complaint (Doc. 46) alleges as follows: Between August 2020 and October 2022, McCollum was

incarcerated at the DCP. To combat the smuggling of contraband, the DCP did not allow prisoners to order their own books. The prison digitized books pertaining to many religions, so prisoners could have continual access to those books. However, McCollum's religion is Santeria, and the prison did not digitize any Santeria books. There was at least one Santeria book available in the "general library," but the waiting list was nine months long. McCollum directed grievances about the issue to Briggs, and specifically asked Briggs if he could order a book "in [Briggs's] name and have him photocopy it[,] but he refused."

Following a motion to dismiss, McCollum was permitted to proceed on a First Amendment free exercise claim and a Fourteenth Amendment equal protection claim against Briggs for damages only.[1] *See* (Doc. 56). After the close of discovery, Briggs moved for summary judgment. (Doc. 88). McCollum filed a timely response (Docs. 98, 99) and, after several extensions of time, a counterstatement of material facts (Doc. 126).

While this case has been pending, McCollum has returned to the

[1] McCollum's claims for permanent injunctive relief were dismissed because he was no longer at the DCP when he filed the operative complaint. Several other claims and defendants were also dismissed, including a Fourteenth Amendment claim relating to overcrowding at the prison. *See* (Docs. 55, 56).

DCP and filed a series of motions for preliminary injunctive relief. Two such motions (Docs. 112, 117) were denied because they were unsupported by evidence and the relief requested was not relevant to the case. One final motion, in which McCollum requests access to a tablet with Santeria literature, remains pending. (Doc. 121).

## II. LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III. MATERIAL FACTS

McCollum's statement of material facts does not comply with the

local rules of this district, because it does not directly address the facts in Briggs's own statement. *See* (Doc. 126); M.D. Pa. L.R. 56.1. Nonetheless, we have considered all the evidence and argument that the parties have submitted. *See* Fed. R. Civ. P. 56(c)(3). Where McCollum has not presented competent evidence to dispute Briggs's statements of fact, those facts are deemed undisputed. *See* Fed. R. Civ. P. 56(e)(2).

The summary judgment record indicates as follows: McCollum attests that he has practiced Santeria since late 2016 or early 2017. (Doc. 126-5 at 3). Prior to June 2021, McCollum was intermittently incarcerated at the DCP and within the Pennsylvania Department of Corrections. At that time, he identified himself within these prisons as Muslim. McCollum now testifies that he did so because he feared harassment from other prisoners and "because socially I would be able to, you know, catch people from different blocks and stuff. But as far as really adhering to the principles of Islam, no." *See* (Doc. 89-3 (McCollum Dep.), 28:21-36:21, 41:21-43:17).

**A. Santeria**

On June 14, 2021, at the DCP, McCollum requested to change his listed religion from Islam to Santeria. Santeria, as practiced by

McCollum, is a religion that incorporates African and Roman Catholic traditions. A Santeria adherent is "required to learn the fundamental principles/teachings . . . [T]here is no specific go to like Islam [has] the Quran, so regular books such as the ones requested by [McCollum] . . . [are] as fundamental as a Christian seeking out the Bible." (Doc. 126-5 at 1-2).

McCollum was given a "Religion Request Form," which he signed on July 9. Therein, he stated that he practiced Santeria in his cell by "mak[ing] food offerings to my saint/'shango'" and "set[ting] up an altar for my ancestors." The requested change was reviewed and approved by a prison chaplain. *See* (Doc. 89-3 at 21-23 (Dep. Exs. 3-5)).

**B. Access to Santeria Literature**

Beginning in July 2021, McCollum submitted several inmate request forms and grievances requesting access to Santeria literature. Neither party has clearly explained the DCP's policies regarding access to religious literature. According to McCollum, the DCP did not allow inmates to have physical books delivered to the prison. The DCP "digitized all books" and created "a religious library and a regular one." Santeria books were not available in the religious library. In the "regular"

library, which was "owned by the Dauphin County Library," an inmate could check out a book for a 14-day period and renew it no more than three times. Although there was some Santeria literature in the regular library, there was a waiting list of six to nine months for these book(s). (Doc. 126-5 at 4-5).

On April 18, 2022, approximately nine months after McCollum's initial requests, Briggs "approved [McCollum] to have physical paper copies of approved Santeria religious material." (*Id.* at 30, Dep. Ex. 11). The reasons for the delay between July 2021 and April 2022 are not entirely clear from the record. In response to McCollum's requests and grievances about this issue, various prison officials responded as follows:

- On August 3, in response to one such request, the prison chaplain wrote: "I plan to check on this about . . . suggested books, then contact the Dauphin Co. Library to see if any are available as [ebooks]. It is your responsibility to name particular books specifically. We do not have the time to search generally."

- In an undated response to a July 24 request, the chaplain wrote: "I located a book called Santeria The Religion by Migene Gonzalez and submitted a request . . . for it to be placed on the tablet."

- On September 19, apparently in response to a request dated July 12, the chaplain wrote: "We recently sent a request to the County Library system with book suggestion(s) for Santeria. They are in process of considering adding . . . books based on funding available + if it is in eBook form."

- On October 19, a further grievance "about [McCollum] not being [allowed] to have materials on the tablet to practice his religion" was forwarded to Briggs.[2]

- On November 3, after McCollum complained in relevant part that he had been "waiting to read a specific book since August 19 and it[']s November," another prison employee responded: "Meeting with Dauphin County library and requesting more titles . . ."

*See* (Doc. 89-3 at 24-29; Doc. 126-2; Doc. 126-3). The record does not explain what became of the inquiries to the Dauphin County library system, but we infer that no Santeria books were added to the prison libraries. After Briggs received his paper copies, a prison chaplain wrote the following memorandum:

> I spoke with [McCollum] regarding his request to have literature on Santeria placed on the tablet. I explained that the religion of Santeria has no prescribed religious books. That Santeria combines elements of Catholicism with enslaved Africans['] beliefs, and he can identify with Catholic traditions and their ceremonies. That there is plenty of information regarding Catholicism on the tablet.
>
> I have also spoken with the staff at Viapath regarding the necessity of being able to add various religions that are not considered mainstream to the electronic tablet. That Dauphin County Prison has a small population of residents that have no religious information available to access on the electronic tablet. The staff at Viapath stated that they were not sure if they could add entire

[2] Although the corresponding grievance is in the record (Doc. 126-3), we are unable to locate the response to that grievance (if any).

> religious history books or lengthy PDF to the tablet, they would investigate it and provide feedback when they had an answer. To date that issue has not been resolved.

(Doc. 126-9).

## IV. DISCUSSION

### A. Personal Involvement

As an initial matter, Briggs claims that he cannot be held liable for any constitutional violation because he was not personally involved in depriving McCollum of Santeria literature. Liability for a constitutional violation under 42 U.S.C. § 1983 requires a defendant's personal involvement, which can be shown by "personal direction [or] actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "[A] supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

Briggs argues that his involvement in this issue was "limited to administrative approval and forwarding requests or grievances," but the record supports an inference that he was substantively involved. McCollum directed one of his requests specifically to Briggs; another

request was forwarded directly to Briggs for his consideration; and it was Briggs, specifically, who "approved [McCollum] to have physical paper copies" in April 2022. *See* (Doc. 89-3 at 27, 30; Doc. 126-2). A reasonable jury could infer Briggs's participation or acquiescence in the ongoing decision not to allow McCollum Santeria literature until April 2022. Accordingly, Briggs is not entitled to summary judgment on this ground.

**B. Fourteenth Amendment**

McCollum brings a Fourteenth Amendment equal protection claim against Briggs. For an equal protection claim, a plaintiff must show that he was intentionally treated differently from similarly situated persons because of membership in a particular protected class. *See Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002). Persons are similarly situated "when they are alike in all relevant aspects." *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (citation omitted).

Here, Briggs is entitled to summary judgment because McCollum has not identified any similarly situated inmates. McCollum believes he is similarly situated to any inmate at the DCP "who has religious beliefs" (Doc. 126-5 at 5), but that broad similarity is insufficient. McCollum offers no evidence that there was any demand for Santeria literature

when the prison digitized its library, so the fact that other religions' books were digitized at that time does not prove differential treatment of Santeria or its adherents. *See Smith v. Kyler*, 295 F. App'x 479, 484 (3d Cir. 2008) (an equal protection claim based on religion requires "similarly situated faiths"); *DeHart v. Horn*, 227 F.3d 47, 60 (3d Cir. 2000) (the Constitution does not require that "every religious sect or group within a prison . . . must have identical facilities") (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)).

On these facts, a similarly situated person would be one who, like McCollum, made a later, *ad hoc* request to digitize a book from a religion that was not already represented. McCollum has not identified any such individuals, and to the extent they existed at the DCP, there is no evidence that they were treated differently from McCollum.[3] Accordingly, Briggs is entitled to summary judgment on this claim.

---

[3] In his affidavit, McCollum alludes to another inmate who "[went] through the same process and received his book" (Doc. 126-5 at 4), but this vague description does not show that the other inmate was similarly situated. The chaplain's May 2022 memorandum referred to a "small population of residents that have no religious information available to access on the electronic tablet" (Doc. 126-9); there is no evidence that anyone in that group received anything that McCollum did not.

### C. First Amendment

Next, McCollum proceeds on a First Amendment free exercise claim against Briggs. "Inmates clearly retain protections afforded by the First Amendment . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). For First Amendment protection to attach, a plaintiff's religious view must be "sincerely held," and the regulation must impose a "substantial burden" on the plaintiff's religious exercise. *See Robinson v. Superintendent*, 693 Fed. Appx. 111, 115 (3d Cir. 2017); *Sutton v. Rasheed*, 323 F.3d 236, 250-51 (3d Cir. 2003).

First, Briggs argues that McCollum's inconsistent access to Santeria literature did not constitute a substantial burden on his religious practice. Briggs relies on *Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007), for the premise that "[d]elays or administrative policies do not rise to a constitutional violation without coercion." (Doc. 94 at 7-9). But that is a misreading of *Washington*, and the case squarely supports McCollum's argument on this point. *Washington* concerned a religion for which "[o]ne of the rituals requires a practitioner to read four different Afro-centric books per day." A prisoner was permitted to keep ten books

in his cell at one time; he could donate additional books to the library, but he could only check out four books at a time, once per week. 497 F.3d at 275. In the context of a RLUIPA claim, the Third Circuit determined that based on the religion's requirements, the ten-book limit constituted a substantial burden. *Id.* at 281-83. *Washington* does not support the idea that a substantial burden requires a showing of "coercion," and the rules imposed on McCollum were significantly more restrictive than the rules at issue in *Washington*.

Briggs further argues that there was no substantial burden because McCollum "was able to practice Santeria privately in his cell," but that is not dispositive. Even if an inmate has some access to some form of religious exercise, "limiting [his] access to the religious literature that he is required to read as part of his practice constitutes a substantial burden."[4] To the extent Briggs contends that Santeria literature could be adequately replaced by "other religious texts relevant to Santeria (*e.g.*,

[4] *Yates v. Painter*, 306 F. App'x 778, 780 (3d Cir. 2009); *see*, *e.g.*, *Tootle v. Long,* No. 1:20-CV-00235-SPB-RAL, 2021 WL 3610034 (W.D. Pa. July 19, 2021) (denial of access to religious literature during a stay of unspecified length in the Restricted Housing Unit); *Johnson v. DeRose*, No. 1:09-CV-0267, 2010 WL 817398, at *6 (M.D. Pa. Mar. 9, 2010) (denial of access to the Bible during a three-week lockdown).

Roman Catholic)" (Doc. 94 at 4), the record shows a genuine dispute of fact on that point. *See Washington*, 497 F.3d at 281-82 (inmate's access to "some books that would impart knowledge about his religion" was not "a palatable alternative").

Some of Briggs's arguments are better understood as a claim that the prison's regulations were justified as a matter of law, but he is not entitled to summary judgment on that basis. A prison regulation can impinge on the right of free exercise only to the extent "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Courts consider four factors determining whether the regulation is reasonable: (1) whether the regulation bears a valid, rational connection to a legitimate and neutral government objective; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives to the regulation. *Robinson v. Wetzel*, 648 F. App'x 168, 173 (3d Cir. 2016) (citing *Turner*, 482 U.S. at 89-90).

On this record, only one of these factors — the existence of

"alternative means of exercising the right" — clearly favors Briggs. For this factor, the question is not whether McCollum had access to literature specifically, but whether he had "alternative means of exercising [his] beliefs generally (*e.g.*, by prayer, worship, meditation, . . . etc.)." *See DeHart*, 227 F.3d at 54 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 417-18 (1989)). The record is clear that he did. *See*, *e.g.*, (Doc. 89-3 at 23).

On the issue of whether the challenged policies promoted legitimate objectives, the record is open to interpretation. Beyond the prison staff's *ad hoc*, contradictory responses to McCollum's complaints, Briggs has not explained what the DCP's policies actually were.[5] Briggs, the party seeking summary judgment, has the burden to explain the prison's rules and the penological interests they support; McCollum is not required to read between the lines of grievance responses and "negat[e] every conceivable legitimate penological interest which might support the denial of his accommodation." *See Sharp v. Johnson*, 669 F.3d 144, 156-58 (3d Cir. 2012) (quotation and citation omitted). Even accepting

---

[5] For example, if we accept that a DCP ban on physical media contributed to the delay, Briggs does not explain why McCollum was ultimately given "physical paper copies" of a Santeria book, or why he could not receive that accommodation more promptly.

Briggs's argument that some delay was caused by "administrative processing, library acquisition, or policy," the record offers no explanation for the roughly six-month delay from November 2021 through April 2022.[6] Further, a jury could infer that McCollum was not permitted Santeria-specific literature in part because the prison staff believed it was sufficient for McCollum to "identify with Catholic traditions and their ceremonies." *See* (Doc. 126-9).

The remaining factors — the impact on prison operations and the alternative options that were available to the DCP — favor McCollum. It appears that this issue was resolved, at least in part, when Briggs authorized McCollum to receive photocopies of approved Santeria literature. From the limited record, this seems to have been a cost-effective alternative that would not have unduly disturbed the operation of the prison. *See Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003) ("If an inmate can point to an alternative that would fully accommodate his

[6] On November 3, a prison employee responded to McCollum by describing a planned "meeting with the Dauphin County library" to request more books, but McCollum's request had already been made to the library several months before. Whether or why the library requests were denied is unclear, and the record shows no evidence of any further attempt to obtain Santeria literature until Briggs approved the paper copies on April 18.

or her rights at a 'de minimis' cost, we can consider that as evidence that the challenged regulation is unreasonable."). Accordingly, Briggs is not entitled to summary judgment on this claim.

**D. Qualified Immunity**

Next, Briggs argues that he is entitled to qualified immunity. Qualified immunity applies to federal and state actors unless (1) the "facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation," and (2) the alleged right was clearly established at the time of the violation. *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (citation omitted). At the summary judgment stage, "the burden is on the defendants to establish they are entitled to qualified immunity." *E.D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019).

Briggs argues, in part, that "[n]o precedent clearly establishes that delays in providing religious texts under neutral policies violate constitutional rights."[7] (Doc. 94 at 10). As explained above, the record

[7] Briggs's reliance on *Wiggins v. Griffin*, 86 F.4th 987 (2d Cir. 2023), is unpersuasive. *See* (Doc. 94 at 10-11). In that case, a plaintiff was denied access to religious services for more than five months due to administrative error, creating a substantial burden on the prisoner's religious practice. *See* 86 F.4th at 991-94. Qualified immunity was granted to one of the four defendants who sought it. In part, *Wiggins* held

*(continued on next page)*

does not sufficiently explain what the policies were, nor establish that they were neutrally applied. There is evidence that prison staff did not permit the literature because they took the position that the practice of Santeria did not require it. While qualified immunity could apply based on a reasonable official's discretion in that regard, the record does not clearly show that any such judgment was reasonable.[8] The existence of a material dispute on that issue forecloses any entitlement to qualified immunity on McCollum's First Amendment claim. *See Stringer v. Cnty. of Bucks*, 141 F.4th 76, 88 (3d Cir. 2025).

**E. Preliminary Injunctive Relief**

Finally, McCollum has also sought preliminary injunctive relief. His claim for permanent injunctive relief was dismissed as moot, because

---

that a defendant's negligence is insufficient for First Amendment liability, but a defendant who "would have known that [access to religious services] depended on their input" and failed to act may be liable. *See id.* at 995-98. Briggs has not presented evidence that resolves whether his actions reflected deliberate indifference; as the party moving for summary judgment, he is not entitled to that inference.

[8] Aside from the chaplain's conclusory statement in the May 2022 memorandum, we find no evidence countering McCollum's attestation that access to Santeria-specific literature is essential to practicing Santeria. *See, e.g.*, *Washington*, 497 F.3d at 275 (religion required access to unspecified "Afro-centric books").

he left the DCP and made no showing or argument that he was going to return. *See* (Doc. 55 at 16, Doc. 56). However, he has since returned to the DCP, and he now requests an order directing that he immediately receives "a tablet with access to Santeria literature."

A plaintiff seeking preliminary injunctive relief must show by clear evidence that there is a "reasonable probability" of success on the merits, and that denial would cause irreparable harm to the plaintiff. *See Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022). McCollum's motion will be denied because has not established either point by clear evidence.

First, McCollum has not explained why he needs a tablet to access Santeria literature given the undisputed fact that Briggs permitted him to have physical copies. To the extent McCollum was no longer authorized to have physical copies after he returned to the DCP, he has not presented clear evidence of that. Moreover, McCollum testified that when he returned to the DCP in 2024, he was once again identifying as Muslim. *See* (Doc. 89-3, 63:7-15). Although he still claims to be practicing the Santeria religion, prisons are not required to indulge a prisoner's attempts to constantly change religions or claim multiple religions,

whether for "social" reasons or other purposes.[9] This fact would belie any finding of a reasonable probability of success on any claim of ongoing violation. Therefore, while McCollum's First Amendment claim relating to the period between July 2021 and April 2022 has survived summary judgment, he is not entitled to preliminary injunctive relief.

## V. CONCLUSION

For the foregoing reasons, Briggs's motion for summary judgment will be granted in part, and McCollum's motion for preliminary injunctive relief will be denied. The case will proceed on McCollum's First Amendment free exercise claim. Unless one of the parties objects within 14 days, this case will be referred to the Court's Prison Litigation Settlement Program. An appropriate order follows.

Dated: August 24, 2026

*s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States District Judge

---

[9] *See DeHart*, 227 F.3d at 52 n.3 ("[T]he asserted religious basis for the request may be rejected as pretext."); *Whitney v. Varner*, No. 3:11-CV-2022, 2016 WL 4988057, at *8 (M.D. Pa. Sept. 19, 2016) (inmate could not establish a "sincerely held" belief in Islam when he declined to indicate it on his prison's religious preference form); *Dolan v. Lowe*, No. 3:14-CV-1436, 2016 WL 1128016, at *8 (M.D. Pa. Mar. 18, 2016) (prison could restrict how often an inmate could change his stated religion).